IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| CASSANDRA L. MILNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:06CV859-SRW |
| ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Cassandra Milner (formerly Cassandra L. Dean) brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

On October 22, 2002, plaintiff filed an application for Supplemental Security Income (SSI). In her application for benefits, plaintiff claims that she is disabled due to "mental illness" (R. 78), specifically, schizophrenia. (R. 80). She indicates that she cannot think "correctly" or understand what she is told to do, and states, "I would get fired from the jobs because I get mad at everyone on[] the job and I be wanting to kill everybody." She reports

that she stopped working on October 15, 2000 when she was fired because she "got angry at a customer." (R. 80). On February 23, 2005, after plaintiff's claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing. At the time of the hearing, plaintiff was 29 years old. (R. 285).

Plaintiff's medical records reveal that in late March of 2002, plaintiff reported to Dr. Chandra Shekar, her treating internal medicine physician at the Greenville Adult and Pediatric Clinic, for a work physical and check up. (R. 148). Dr. Shekar diagnosed plaintiff with sinusitis, allergic rhinitis, nicotine addiction, and "anxiety/depression." She prescribed Wellbutrin. (R. 149). Dr. Shekar did not make any notation regarding anxiety or depression in treatment notes for office visits on April 9, 2002 and August 2002, but again diagnosed anxiety and depression and prescribed Wellbutrin during office visits on August 21, September 4 and September 19, 2002. (R. 138-47). There are no records of treatment by Dr. Shekar after September 19, 2002. (Exhibit 1F).

On October 1, 2002, plaintiff was admitted to Crenshaw Community Hospital with an admission diagnosis of "schizoaffective disorder, depressed, with psychotic features." (R. 166). She reported symptoms of depression, auditory and visual hallucinations, and thoughts of suicide. (Id.) She also reported that she dropped out of school after ninth grade to go to work, and she denied any learning difficulties. (R. 170). She was admitted to the psychiatric unit with suicide precautions and treated with medication. (R. 168). Dr. Thomas L. Smith, Jr., the treating psychiatrist during plaintiff's hospitalization, judged plaintiff's IQ to be "at normal range" (id.; R. 170) and with regard to an Axis II diagnosis, indicated "None

established." (R. 166).[1]  Plaintiff's condition improved and, on October 7, 2002, she was discharged in stable condition, on medication, and with a "guarded" prognosis.  She was scheduled to follow up on an outpatient basis at the Greenville Mental Health Center. (R. 169).

On October 9, 2002, plaintiff was evaluated by Robert Powell, a licensed professional counselor at the South Central Alabama Mental Health Center in Greenville, Alabama (R. 190-97).  Plaintiff was again diagnosed on Axis I with schizoaffective disorder, depressed type, with psychotic features; she had no Axis II diagnosis.  (R. 195, 207).  Plaintiff advised Powell that she had a ninth grade education and "just couldn't comprehend."  (R. 190).  On November 13, 2002, plaintiff was evaluated by a staff psychiatrist for a "med assessment." (R. 188).  She was continued on medications.  (R. 198).

On January 23, 2003, psychologist Guy Renfro conducted a consultative evaluation of the plaintiff.  Plaintiff reported that she failed the sixth grade on two or three occasions, and that she failed the ninth grade.  She stated that teachers and administrators wanted to place her in special education, but her mother would not allow this.  She further described exhibiting numerous behavior problems while she was in school.  She stated that her longest period of employment was about five or six months and that she frequently lost jobs "because of temper problems."  (R. 209-210).  Dr. Renfro conducted a mental status examination and "estimated that she is functioning in the borderline range of intelligence."  (R. 211).  Dr.

---

[1] "Axis II is for reporting Personality Disorders and Mental Retardation. . . . The listing of Personality Disorders and Mental Retardation on a separate axis ensures that consideration will be given to the possible presence of Personality Disorders and Mental Retardation that might otherwise be overlooked when attention is directed to the usually more florid Axis I disorders." (DSM-IV-TR (2000), p. 28).

3

Renfro diagnosed plaintiff as follows:

> Axis I       Schizoaffective disorder, depressive type, psychotic symptoms currently under control with medication (295.70)
>
> Axis II      Borderline intellectual functioning (v62.89)
>
> Axis III     Status post hysterectomy
>
> Axis IV     Psychosocial Stressors: chronic psychiatric problems
>
> Axis V      Current GAF: 50

(R. 212). He concluded, "It does appear appropriate that Ms. Dean continue to receive psychiatric treatment for her schizoaffective disorder. Given her limited intellectual functioning and the residual symptoms of schizoaffective disorder [restricted affect, reduced socialization, and problems with concentration and intellectual functioning], it would be advisable for some other individual to manage her financial affairs should she be granted disability benefits." (Id.).

On February 20, 2003, Gordon Rankart, Ph.D., a non-examining agency medical consultant, completed a mental residual functional capacity assessment. He determined that plaintiff had moderate limitations in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to interact appropriately with the general public and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. He concluded that plaintiff had no significant limitations in any other mental activities included on the form. He found plaintiff to be able to "comprehend and recall brief and

4

uncomplicated directions" and to "carry out short and simple instructions," and that her attention and concentration were "adequate for two-hour periods across an 8-hour day." He further noted "[a]ppropriate social interaction if considered for casual and limited contact with public and coworkers." (R. 215).

On October 10, 2003, plaintiff reported to the South Central Alabama Mental Health Center for psychotherapy. Although she had recent ideations of suicide, her symptoms were subsiding. (R. 252). On January 16, 2004, plaintiff reported occasional suicidal ideations, but indicated that she was "doing better." (R. 254). Plaintiff was prescribed psychiatric medications by a staff psychiatrist on January 19, 2004. (R. 253).

On March 8, 2004, plaintiff sought admission to the psychiatric ward at Crenshaw Community Hospital, reporting that she was hearing voices and seeing things. (R. 260). Dr. Smith diagnosed "[s]chizoaffective disorder, bipolar type, with psychotic features." He again found no diagnosis established on Axis II and judged plaintiff's IQ to be "at normal range." (R. 261-62). He admitted plaintiff to the psychiatric unit with suicide precautions and treated her with medication and psychotherapy. Dr. Smith discharged plaintiff in an improved condition on March 15, 2004, on medication and with an appointment for follow-up at the Greenville Mental Health Center. (R. 263).

Three weeks later, on April 3, 2004, plaintiff reported to W.G. Brantley, Ph.D., for a consultative mental examination. Dr. Brantley administered IQ testing which resulted in a Verbal IQ score of 67, a Performance IQ of 73 and a Full-Scale IQ of 67. Dr. Brantley diagnosed plaintiff with "Schizoaffective Disorder (295.70) In Slight Remission, and Mild

5

Mental Retardation (317)." (R. 239). Dr. Brantley concluded that plaintiff had "marked" limitations in her ability to use judgment in detailed or complex work-related decisions and her ability to understand, remember and carry out detailed or complex instructions, and "moderate" limitations in her ability to respond appropriately to supervisors, co-workers, and customers or other members of the general public, to maintain social functioning and to deal with changes in a routine work setting. (R. 241-42). Dr. Brantley stated that mental illness and mental retardation "combine to impair most all functional areas ranging from work to child care." (R. 242). He concluded that she could not manage benefits in her own best interest. (Id.).

On August 31, 2004, plaintiff reported to Powell, her counselor at South Central Alabama Mental Health Center, that she was having thoughts about committing suicide with medication. (R. 251). Although it appears from the treatment note that plaintiff and the counselor discussed hospitalization at Crenshaw County Hospital, the administrative record includes no medical records from a August 2004 hospitalization.[2] On February 2, 2005, plaintiff was reevaluated by Elizabeth Harris, a different counselor. Harris diagnosed plaintiff on Axis I with schizoaffective disorder, depressed type, with psychotic features. She made no Axis II diagnosis, and noted on Axis III that no medical issues were reported. On Axis IV, Harris noted "psychosocial/economic stressors" and "poor socialization and work skills, leading to dependency." Harris assigned a GAF score of 59. (R. 248).

---

[2] See Hearing Transcript, R. 288 (Plaintiff's attorney states, "She says [the hospitalization occurred in] March of '04. There's reference in the mental health notes to them assisting her to be admitted in August of '04. But – so, I can only say it's one or the other.").

6

On February 22, 2005, the day before the administrative hearing, plaintiff's counsel provided the ALJ with a residual functional capacity questionnaire completed on February 12, 2005 by Dr. Winston Pineda.[3] Dr. Pineda rates plaintiff's limitations as "marked" in her ability to understand, carry out and remember instructions, respond appropriately to supervision and perform simple tasks in a work setting. In all remaining areas listed on the form – performing repetitive tasks, responding appropriately to co-workers, responding to customary work pressures, maintaining social functioning, activities of daily living, and deficiencies of concentration, persistence or pace – Dr. Pineda rated plaintiff's limitations as "extreme." (R. 257-58).

At the hearing, plaintiff testified as follows:

Plaintiff lives with her cousin, her cousin's girlfriend and two of plaintiff's children. She has three children, ages eight, ten and twelve. She completed eighth grade, but not ninth grade. She learned to read and write, and can do simple arithmetic. She has worked as a cook and as a cashier, but has never worked full time. She worked part-time at Krystal, but her employment ended "because [she] cussed out a customer." She has not looked for work and does not know whether she can work. She had a suicide attempt in 1996 and was then hospitalized. She had no other mental health treatment until she was again hospitalized in the Crenshaw County mental health wing in October 2002 because she was having thoughts of suicide. She has been going to the mental health center since that hospitalization. She was

---

[3] The form is styled "Supplemental Questionnaire as to Residual Functional Capacity" and the preamble of the form refers to the completing physician's narrative report. (R. 257). There is no narrative report from Pineda in the record.

7

again hospitalized at Crenshaw County hospital in 2004.  She cries a lot and thinks of ways she can kill herself and other people.  She is presently taking her medications.  The main problem she might have if she tried to work five days a week for eight hours a day is "[k]illing somebody."  (R. 285-90).

Dr. McKeown, a medical expert, testified that the dosages plaintiff takes of Trileptal, Prozac and Abilify are "basically starting doses."  (R. 292).  Dr. McKeown noted that plaintiff's school records include seventh grade Otis-Lennon achievement test results which showed plaintiff to be "essentially on grade level academically with low average intellectual function," and stated his opinion that the Otis-Lennon scores were "quite contradictory to those scores found in [Dr. Warren Brantley's IQ assessment]."  (Id.).  Dr. McKeown stated his opinion that Dr. Pineda's February 2005 assessment was "somewhat of an overstatement" as it suggests an individual with "extreme dysfunction" who "probably would not be capable of functioning outside of an institutional setting."  (R. 293).  He based this opinion on the dosages of plaintiff's medications (which he described as "very minimal"), her school records, her driver's license, reports indicating "at least the capability for activities of daily living," plaintiff's record of limited treatment, her past work history, and past assessments indicating that when plaintiff is on medication, she is reasonably stable.  (R. 293-94).

Lane Robinson, the vocational expert, testified that plaintiff's past work did not appear to "meet[] SGA."  He testified as to jobs available to a hypothetical candidate for employment of plaintiff's age, education and work experience, who has: (1) the limitations reflected in Exhibits 6F and 7F (Dr. Rankart's assessment); (2) the limitations testified to by

8

Dr. McKeown; and (3) the limitations described in Exhibit 9F (Dr. Brantley's assessment). He further testified that a candidate with the limitations described by Dr. Pineda could not do competitive work. (R. 295-98).

After the hearing, the ALJ submitted a written questionnaire to Dr. McKeown. Dr. McKeown responded, *inter alia*, that plaintiff's history and school records do not support a finding that she meets Listing 12.05 but, rather, that they "suggest at least borderline I.Q." He stated, "Claimant would have moderate impairment with complex & varied tasks. No more than mild for other areas[.] Hospital records indicate significant improvement during hospitalization (evidenced by discharge GAF) and would reflect ability to do work related activities if she is treatment compliant. (R. 277-81).

The ALJ rendered a decision on December 6, 2005, in which he found that the plaintiff has severe impairments, including a schizoaffective disorder and borderline intellectual function. He further concluded that plaintiff's impairments did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform her past relevant work as a fast food worker and other jobs existing in significant numbers in the regional and national economies. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. On August 3, 2006, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ stands as the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The

court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff challenges the Commissioner's decision, arguing that the decision is not supported by substantial evidence. Specifically, plaintiff argues that the ALJ erred by failing to properly consider listing 12.05C of the regulations and that he also failed to give proper consideration to the opinion of Dr. Winston Pineda, plaintiff's treating physician, and gave undue weight to non-examining reviewing consultants.

Listing 12.05C. For a claimant to be found disabled under any part of Listing 12.05, she must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" and, in addition,

meet one of the four requirements described in subparagraphs A through D.  See Listing 12.05 (introductory paragraph). Listing 12.05C requires "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  The standard for an "additional and significant" limitation is the same as for a "severe" impairment under 20 C.F.R. 404.1520(c).

Plaintiff argues that the ALJ erred in failing to conclude that she meets Listing 12.05C because of her full-scale IQ score of 67 and her schizoaffective disorder.  However, "[t]he ALJ was not required to find that [plaintiff] was mentally retarded based on the results of the IQ test."  Popp v. Heckler, 779 F.2d 1497, 1500 (11th Cir. 1986).  Rather, the ALJ is required to consider those results in conjunction with other evidence of record, including medical evidence and the claimant's daily activities, in determining whether the claimant is mentally retarded. Id.  The ALJ acknowledged that the results of IQ testing administered by Dr. Brantley place plaintiff in the mildly mentally retarded range. (R. 27, 28).  However, the ALJ was not required to accept those IQ scores as valid.  In this case he found, instead, that plaintiff suffers from borderline intellectual functioning rather than mental retardation.  (R. 27). The ALJ noted that "Mental Health Authorities declined to even diagnose the claimant on Axis II." (R. 28).  As noted above, Dr. Smith – plaintiff's treating psychiatrist during her hospitalizations in October 2002 and March 2004 – determined that no Axis II diagnosis was established.  He judged her IQ to be "at normal range."  (R. 166, 261-62).  Additionally, plaintiff's counselors at the South Central Alabama Mental Health Center made no Axis II diagnoses.  (R. 195, 207 (2002); R. 248 (2005)).  The ALJ further observed that plaintiff's

school records show that she attended regular classes during the school year. Plaintiff told the consultative examiner, Dr. Renfro, that her teachers and school administrators wanted to place her in special education classes but that her mother would not allow this. (R. 210). There were no school records before the ALJ other than limited records for seventh through ninth grade. These records indicate that plaintiff was not in special education classes (see R. 126) and, thus, the reason stated by the ALJ is supported by substantial evidence.[4] The ALJ further noted the opinion of the medical expert, Dr. McKeown, that plaintiff's school records and history suggested "a borderline IQ." (R. 27-28; see also R. 292 (McKeown's testimony that plaintiff's Otis-Lennon scores were "quite contradictory" to the IQ testing results)).[5, 6] The ALJ's Popp analysis is supported by substantial evidence and, thus, he did not err by rejecting the IQ scores and finding that plaintiff suffered from borderline

---

[4] The portion of the transcript relating to plaintiff's eighth grade year is largely illegible, but it appears that plaintiff obtained passing grades in only two of her classes. (R. 122). Her final grades in ninth grade were all failing grades (id.), but plaintiff testified at the hearing that she did not complete ninth grade (R. 286). Plaintiff's records for seventh grade reveal that she received passing grades – including two Bs and two Cs – in all of her classes except for science. Plaintiff had a passing grade in science during the second semester of seventh grade. (R. 122). Additionally, plaintiff's record includes the results of standardized testing administered during her seventh grade year. (R. 124). Plaintiff's score on the Otis-Lennon achievement test, which provides an extrapolated intellectual score, showed plaintiff to be "essentially on grade level academically with low average intellectual function." (R. 292).

[5] Since plaintiff did not submit her school records until the day prior to the hearing before the ALJ (see R. 119), Dr. McKeown was the only psychologist of record who had the opportunity to consider the school records.

[6] The ALJ also noted that plaintiff did not indicate that she requires assistance caring for herself or her three children. As to the children, this observation is not supported by substantial evidence. The record reflects that plaintiff had custody of two of the three children at the time of the hearing (R. 285), but earlier had custody of only one child (R. 210). There is no indication in the record that she took care of all three children.

intellectual functioning rather than mental retardation.[7]   Accordingly, plaintiff's argument that she meets Listing 12.05C fails.[8]

The Weight Accorded to Medical Opinions.  Plaintiff testified that, at the time of the hearing, Dr. Pineda was her "main doctor" at the mental health center."  (R. 289).  As noted above, Dr. Pineda found plaintiff to have "extreme" and "marked" functional limitations in several work-related areas that would, according to the vocational expert's testimony, preclude gainful employment.

> The opinion of a treating physician . . . "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). [The Eleventh Circuit] has concluded "good cause" exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. Id.  When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate [his or her] reasons.  Id.

Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  As the Commissioner argues, none of the treatment records from the mental health center appear to bear Dr. Pineda's signature, and there is no indication in the treatment records that he ever personally evaluated the plaintiff.  Thus, the medical records do not support plaintiff's assertion that Dr. Pineda's opinion is entitled to the weight generally accorded to the opinions of treating physicians.

---

[7] Additionally, Dr. Renfro, another consultative examiner, estimated based on his observations of the plaintiff that she was "functioning in the borderline range of intelligence."  (R. 211).

[8] See also Henry v. Barnhart, 2005 WL 3150508 (11th Cir. Nov. 25, 2005)(concluding, in a child's disability case, that evidence that student took "some regular classes, obtain[ed] low passing grades, and "even excell[ed] at times" constituted substantial evidence in support of ALJ's finding that claimant was functioning at a higher level than her IQ scores demonstrated).

See Wainwright v. Commissioner of Social Security Administration, 2007 WL 708971 (11th Cir. Mar. 9, 2007)(unpublished opinion)(opinion of physician who examined plaintiff only once was "not entitled to any special weight"). Even assuming that he is plaintiff's treating psychiatrist, however, the ALJ articulated adequate reasons, supported by substantial evidence, for discounting Dr. Pineda's assessment. The ALJ noted that Dr. Pineda indicates that a psychological evaluation was performed, but he provided no information about it. (R. 27, 258). As discussed above, the form completed by Dr. Pineda references a narrative report; however, no such report from Dr. Pineda is included in the record. The form itself includes no explanation of the psychological evaluation or of Dr. Pineda's reasons for his conclusions regarding plaintiff's functional limitations. (R. 257-58). Additionally, Dr. Pineda lists side effects of medication ("nausea, increased and/or decreased appetite as well as induced sleepiness"). The ALJ notes that the record reveals that plaintiff had a good response to medications and did not experience side effects. (R. 28). Records from the mental health center show that plaintiff was on her current medications (Abilify, Prozac and Trileptal) at least as early as August 2003. (R. 255). Treatment notes from subsequent visits at the mental health center indicate that plaintiff was experiencing no side effects from medication. (R. 252 (10/10/03); R. 254 (1/16/04)). The ALJ further reasoned that Dr. Pineda's conclusions are contradicted by his treatment records. The ALJ noted that on February 2, 2005 – just ten days before Dr. Pineda completed the assessment form – records from the mental health center show that plaintiff had a GAF of 59 and that, according to the DSM-IV, a Global Assessment of Functioning of between 51 and 60 represents moderate

14

symptoms or moderate difficulty in social, occupational or school functioning. (R. 28, 248). See Penyweit v. Barnhart, 2005 WL 3288134, **1 (8th Cir. Dec. 6, 2005)(unpublished opinion)("The ALJ properly discounted Dr. Ruttan's July 2002 mental RFC opinion to the extent it was vague and inconsistent with her global-assessment-of-functioning rating."); Goff v. Barnhart, 421 F.3d 785 (8th Cir. 2005)(ALJ did not err by failing to give controlling weight to treating psychiatrist's opinion; GAF score of 58 was "inconsistent with Dr. Okiishi's opinion that [claimant] suffers from extreme limitations"). The ALJ demonstrated good cause for discrediting Dr. Pineda's opinion, because that opinion was both conclusory and contradicted by records from the mental health center.

Plaintiff argues that the ALJ erred by crediting the opinions of non-examining medical consultants over that of examining medical sources. The ALJ adopted the RFC assessment of Dr. Rankart (R. 29, Finding No. 4), and gave "substantial weight" to the opinion of Dr. McKeown (R. 28). Social Security Ruling 96-6p provides that "[f]indings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of non-examining sources at the administrative law judge and Appeals Council levels of administrative review." The Ruling indicates that the medical opinions of such consultants must be considered, and states that "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." The opinions of non-examining medical sources, "*when contrary to those of examining [sources]*, are entitled

15

to little weight in a disability case, and standing alone do not constitute substantial evidence." Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987)(emphasis added). However, the ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources. Edwards v. Sullivan, 937 F.2d 580, 584-85 (11th Cir. 1991).

Plaintiff argues that the opinions of Rankart and McKeown conflicted with the opinions of Dr. Pineda and the Commissioner's consultative examiners. As noted above, the ALJ did not err in failing to credit Dr. Pineda's opinion regarding plaintiff's functional limitations.

The ALJ was entitled to rely on the opinions of Rankart and McKeown if they did not conflict with those of Renfro and Brantley. The plaintiff points specifically to Dr. Renfro's assignment of a GAF score of 50, his observation of "severe difficulties with concentration and intellectual functioning," and his recommendation of a representative payee for the plaintiff if she is awarded benefits. She further argues that Dr. Brantley has "noted significant limitations as far as vocational and social functioning and further reported IQ scores which demonstrate[] mental retardation." (Doc. # 12, p. 9)

Upon a careful review of the specific functional limitations described in the various reports and testimony, the court concludes that there is no significant conflict between the opinions of the non-examining sources and the consultative examiners.

Plaintiff argues that Dr. Renfro noted "severe difficulties with concentration and intellectual functioning." (Doc. # 12, p. 9). However, while Dr. Renfro observed that plaintiff has "problems with concentration and intellectual functioning," (R. 212) he

diagnosed her with *borderline* intellectual functioning (id.) and specifically stated that "[h]er attention and concentration skills were *mildly* impaired." (R. 211)(emphasis added).

A GAF score of 41 to 50 is indicative of *either* serious symptoms or any serious impairment in social, occupational or school functioning.[9] Dr. Renfro's assignment of a current GAF score of 50 is, accordingly, an observation about plaintiff's condition that is ambiguous with regard to specific functional limitations. See 65 FR 50746, 50764-65 (August 21, 2000)(Commissioner declined to include reference to GAF scores in introductory paragraphs of Listing 12.00D, noting that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings"); see also Kornecky v. Commissioner of Social Security, 2006 WL 305648, **13-14 (6th Cir. Feb. 9, 2006)("According to the DSM's explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning. . . . [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place."); Wilkins v. Barnhart, 2003 WL 21462579, **4 (7th Cir. Jun. 20, 2003)("[T]he GAF scale is intended to be used to make treatment decisions, . . . and nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score.").

Dr. Renfro recommended that some other individual manage plaintiff's financial affairs, based on her limited intellectual functioning and residual symptoms of

---

[9] DSM-IV-TR (2000), p. 34; see also id. at 33 ("[I]n situations where the individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two. For example, the GAF rating for an individual who is a significant danger to self but is otherwise functioning well would be below 20.").

17

schizoaffective disorder, which he described as "a restricted affect, reduced socialization, and problems with concentration and intellectual functioning." (R. 212). Dr. Rankart's assessment that plaintiff is "[a]ble to comprehend and recall brief and uncomplicated directions" and to "carry out short and simple instructions" and Dr. McKeown's assessment that plaintiff would have a "moderate impairment with complex [and] varied tasks" are not inconsistent with Dr. Renfro's recommendation.

With regard to Dr. Brantley, plaintiff argues that he has "noted significant limitations as far as vocational and social functioning and further reported IQ scores which demonstrate[] mental retardation." (Doc. # 12, p. 9). As discussed *supra*, the ALJ did not err in failing to credit the IQ scores. The RFC form used by Dr. Brantley is not identical to the one used by Dr. Rankart, the non-examining medical advisor. However, Dr. Brantley noted "marked" limitations in plaintiff's abilities to understand, remember, and carry out detailed or complex instructions and her ability to use judgment in detailed or complex work-related decisions. (R. 241-42). Dr. Rankart determined that plaintiff suffered from "moderate" limitations in her ability to understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods. Again, however, Dr. Rankart's narrative assessment that plaintiff is "[a]ble to comprehend and recall brief and uncomplicated directions" and to "carry out short and simple instructions" is not significantly inconsistent with Dr. Renfro's assessment.[10,11] There

---

[10] Even if the ALJ erred in relying on Dr. Rankart's or Dr. McKeown's assessments because they were found to conflict with Dr. Brantley's assessment, the error would be harmless. The vocational expert testified at the hearing that a hypothetical candidate with the limitations set forth in Dr. Brantley's assessment could perform all of the same jobs she listed as available for a hypothetical candidate with the limitations set

18

is no significant conflict between the opinions of the non-examining medical sources and those of the consultative examiners and, thus, the ALJ did not err in relying on the opinions of Dr. Rankart and Dr. McKeown.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is due to be affirmed. A separate judgment will be entered.

Done, this 11th day of October, 2007.

                                              /s/ Susan Russ Walker
                                              SUSAN RUSS WALKER
                                              UNITED STATES MAGISTRATE JUDGE

---

forth in Dr. Rankart's RFC assessment, and in Dr. McKeown's hearing testimony. (R. 295-97).

[11] Although Dr. Brantley states that "MI + MR combine to impair most all Functional areas ranging From work to child care" he does not assign specific degrees of limitation other than by check-marks on the RFC form. (R. 241-42).